**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YIORGOS MARAVELIAS,<br><br>Plaintiff,<br><br>v.<br><br>RUTGERS THE STATE UNIVERSITY OF NEW JERSEY, DEAN JOHANNA BOND, DEAN SARAH K. REGINA, POLICE OFFICER EDWIN GONZALEZ, POLICE OFFICER OSCAR TORRES, CHIEF OF POLICE CARMELO HUERTAS, (EACH IN THEIR PERSONAL AND OFFICIAL CAPACITIES) NEWARK WATER COALITION, ANTHONY DIAZ (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES) JOHN DOES 1-100 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN), ABC CORPORATIONS 1-25 (FICTITIOUS BUSINESSES OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTIONS HEREIN),<br><br>Defendants. | Case No.: 2:26-cv-04240 WJM-JBC<br><br>FIRST AMENDED COMPLAINT<br><br>Jury Trial Demanded Under Fed. R. Civ. P. 38(b) |

For his Complaint, Plaintiff Yiorgos Maravelia, by and through his attorneys, states and alleges as follows:

**INTRODUCTION**

1. Plaintiff is a disabled United States Army veteran who attended Rutgers Law School Newark.

2. On October 7, 2023, Hamas attacked Israel leading to a controversial

Isarel-Palestine war. Pro-Palestinian protests on the Rutgers Law Newark campus began soon after. Plaintiff exercised his constitutional right to counterprotest in support of Israel and the United States.

3. Rutgers Law administrators, disfavoring Plaintiff's political views and perceiving him as Jewish, discriminated against Plaintiff and conspired to violate Plaintiff's rights to freedom of speech and expression.

4. While counterprotesting at the Rutgers Law Newark pro-Palestinian protest encampment on May 2, 2024, Plaintiff was subjected to a false arrest by Rutgers Police based on his disfavored political speech, violating his constitutional rights.

5. The Newark Water Coalition and their CEO Anthony Diaz planned, executed, and operated the Rutgers Law Newark protest encampment with reckless disregard for the Plaintiff's contractual right to an education.

6. Plaintiff brings this lawsuit against Defendants under the New Jersey Law Against Discrimination, New Jersey Civil Rights Act, Section 504 of the Rehabilitation Act of 1973, and associated torts.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question), and Section 504 of the Rehabilitation Act of 1973.

8. Venue is proper in the District of New Jersey, Newark Vicinage, pursuant to 28 U.8.C. § 1391(b) because the events, acts, and omissions giving rise to Plaintiff's claims occurred in this judicial district.

**THE PARTIES**

9. Yiorgos Maravelias, ("Plaintiff") is a former Rutgers Law School Newark student, and a disabled, medically retired, United States Army veteran.

10. Defendant Rutgers the State University of New Jersey is a public university operating a law school in Newark, New Jersey.

11. Defendant Johanna Bond is the Dean of Rutgers Law School.

12. Defendant Sarah K. Regina is the Associate Dean for Student Affairs at Rutgers Law School Newark.

13. Defendant Carmelo Huertas is the Chief of the Rutgers Newark University Police Department.

14. Officer Edwin Gonzalez is a Rutgers University Police Officer.

15. Defendant Newark Water Coalition is a 501(c)(3) non-profit organization that engages in political activism, including funding, planning, and implementation of the Rutgers Law Newark protest encampment.

16. Defendant Anthony Diaz is the cofounder/Chief Executive Officer of the Newark Water Coalition, a political activist, and the leader, planner, funding source, organizer, and media spokesman of the Rutgers Law School Newark May-June 2024 protest encampment.

17. Plaintiffs John Does 1-100 are fictitious individuals or entities who have liability to the Plaintiff for any of the causes of action brought in this Complaint, identities currently unknown.

18. Defendants ABC Corporations 1–25 are fictitious businesses or entities who have liability to the Plaintiff for any causes of action below.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

19. Rutgers Law School Newark has a long and celebrated history of campus political activism.

20. Rutgers Law officially endorses a progressive-left political viewpoint.

21. Rutgers Law has an anti-racist policy incompatible with state and federal anti-discrimination laws.

22. Rutgers anti-racist policy mandates unlawful discrimination.

23. Rutgers Law adopted this discriminatory philosophy under their "Anti-Racist Principles & Action" policy which remains in place today.[1]

24. A relevant section of the Anti-Racist Principles & Actions policy reads, "We… join in solidarity with those… elsewhere who stand in protest against a widespread pattern of state-sanctioned violence directed against… other oppressed communities."

25. Rutgers policy extends beyond domestic issues, to international causes, including the Israel–Palestine conflict, and offers a binary worldview of oppressors v oppressed.

26. The Anti-Racist Principles & Action policy states, "We call for… dismantling of all systems of… oppression and…urgent action to end state-sanctioned violence against… oppressed communities, no matter the cost."

---

1. [1] https://law.rutgers.edu/about-us/diversity-and-inclusion/anti-racist-principles-action Note: The Anti-Racist Principles & Action policy is an official endorsement and restatement of an earlier Rutgers faculty Resolution issued on June 23, 2020.

27. Rutgers Law Newark is the home to the controversial Center for Security Race and Rights ("CSRR") led by Professor Sahar Aziz, ("Aziz").
28. CSRR sponsored programing opposes Israel, the United States military, and is pro-Palestinian in nature, endorsing a philosophy of Muslim identity, not as religion, but as race.
29. The Racial Muslim ideology intersects with the Anti-Racist Principles & Action policy, defaulting Defendant Rutgers' favored political view to Palestinians as oppressed indigenous persons, and Israelis as oppressive colonizers, to be opposed, "no matter the cost."
30. During the relevant time of this Complaint, Rutgers Law School Newark offered Continuing Legal Education almost exclusively related to pro-Palestinian political positions on the Israel/Hamas conflict.
31. In 2021 over 50 Rutgers Law School faculty and administrators endorsed the Palestine and Praxis manifesto, committing to supporting student activism on campus in furtherance of pro-Palestinian causes.
32. Among the Rutgers signatories of Palestine and Praxis is Professor Aziz.
33. On May 3, 2021, Rutgers faculty members issued a letter titled "Rutgers University Faculty Stand in Solidarity with the Palestinian People."
34. In pertinent part the letter states, "… faculty condemn Israel's military assault against the Palestinian people… We join and welcome… all colleagues committed to combatting… settler colonialism."
35. The faculty letter condemns opposing political viewpoints, "The language of

both-sidedness… erases the… power that Israel… has over Palestine.[2]”

36. Dean David Lopez and seven Law School faculty endorsed the letter.

37. It is within the context of this officially favored political worldview that Plaintiff's rights were violated by Defendant Rutgers.

38. On October 7, 2023, Hamas mounted an attack and invasion of Israel killing 1,200 and kidnapping 200.

39. A controversial war between Israel and Hamas then commenced.

40. Pro-Palestinian campus protests began nationwide against the war.

41. Pro-Palestinian protests on the Rutgers Law campus included flyers, memorials lauding “martyrs,” posters, and signage supporting Hamas.

42. Protestors blocked entrances, displaying anti-American, anti-Israel, pro-Hamas slogans, engaging in disruptive chants and harangues.

43. The CSRR issued exhortations to protest, utilizing Rutgers resources to spread anti-Isreal, pro-Palestinian messaging.

44. Anti-Israel fervor made the campus hostile to Jewish students, where threats and harassment of Jewish students became routine.

45. On-campus anti-Israel, antisemitic, anti-military, and anti-American political activism caused Plaintiff deep concern.

46. Plaintiff was troubled by pro-Hamas messaging and Jewish classmates being harassed, threatened, and discriminated against on campus.

47. Plaintiff’s studies were disrupted by chaotic protests and disorderly

---

[2] https://docs.google.com/forms/d/e/1FAIpQLSdJY2E2jUSW6eWCcBb3ELSexf1ZqWcaFh0eWZ-ewgXpTgQNLA/viewform

behavior in classrooms and common areas of the school.

48. On November 15, 2023, Plaintiff noticed pro-Palestinian, anti-American and anti-Israel signage posted throughout the campus.

49. Plaintiff inquired of administration about policy on posting flyers and was told by Defendant Regina there was no such policy.

50. On November 21,2023 protestors began appropriating common areas and posting signage such as, "Murdered by Israel" picturing a child, claims of "genocide," and other provocative messaging.

51. Concerned by this one-sided political expression, Plaintiff made his own flyers and set up a table adjacent to pro-Palestinian student protestors.

52. Plaintiff engaged in constitutionally protected political speech, displaying flyers with pro-American, pro-Israel viewpoints, critical of Hamas.

53. Plaintiff's display brought engagement from law students, some critical, some supportive of diversity of opinions, and some simply curious.

54. Later in the day, Professor Aziz removed the Plaintiff's flyers.

55. Plaintiff approached Aziz, whom he was unfamiliar with, and asked why she was removing his flyers.

56. Aziz claimed students cannot place flyers outside tack boards.

57. Plaintiff advised Aziz there was no policy, but Aziz asserted, “There is a policy” and claimed to be an administrator.

58. When Plaintiff requested Aziz produce the policy, Aziz instead escorted Plaintiff to the Deans' office and demanded to see the Dean on duty.

59. Dean Cate Lysionek told Aziz no Dean was on duty, and Aziz then left with

Plaintiff's flyers.

60. Plaintiff was concerned Aziz did not produce the alleged policy, and discussed the matter with Lysionek who confirmed there was no policy.

61. After leaving the Deans' suite, Plaintiff encountered Aziz who sarcastically asked, "Did you get your policy?"

62. Plaintiff later discovered Aziz is a Rutgers law Professor, pro-Palestinian advocate, and Director of the CSRR.

63. Disturbed by his encounter with Aziz, Plaintiff requested Defendant Bond provide justification for removal and destruction of his political speech.

64. Plaintiff complained to Dean Bond that Aziz violated his First Amendment right to engage in speech in a designated forum for political speech.

65. Plaintiff asked Defendant Bond if a political speech policy existed, and what safeguards exist to ensure policy is enforced equitably.

66. Plaintiff requested Defendant Bond set up a meeting with Plaintiff, herself, Defendant Regina, and Aziz so he can be assured Aziz removing political speech, was legally/ethically appropriate.

67. On November 28, 2023, Plaintiff again emailed Defendant Bond, requesting justification for Aziz's behavior and complaining he suffered negative mental health effects due to being embarrassed, belittled, and harassed by Aziz in front of his law student peers.

68. Plaintiff explained as a veteran who had his rights violated, receiving no response compounded mental anguish over the incident.

69. Defendant Bond spuriously offered Plaintiff mental health treatment, and

a referral to the Office of Employment Equity if the Plaintiff believed it was a matter of discrimination based on protected class.

70. Plaintiff told Defndant Bond that if Rutgers Law was unwilling to address his complaints about Aziz, he would seek counsel and contact Rutgers President Jonathan Holloway.

71. A meeting was scheduled, then cancelled by Defendant Bond, claiming Plaintiff's "tone" indicated a meeting would be unproductive.

72. Having made no progress holding Aziz accountable through the law school, Plaintiff emailed Rutgers President Holloway on January 4, 2024.

73. Plaintiff listed his concerns in an email to Holloway as, "violation of first amendment rights" alleging misconduct by Aziz removing his flyers; An automated "received" message was the only reply.

74. Unknown to Plaintiff, Aziz, Defendants Bond and Regina exchanged emails on November 24, 2023, with Aziz describing Plaintiff as the "Jewish law student who alleges the removal of his posters conflating Hamas and Arabs as terrorists were taken down contrary to law school policy."

75. Defendants perceived Plaintiff as Jewish.

76. These experiences chilled Plaintiff's speech, and while he remained vocal in the classroom, he refrained from counterprotest fearing retaliation.

77. On May 1, 2024, activists established a pro-Palestinian encampment at Rutgers Law Newark; Defendant Rutgers did nothing to stop it.

78. On May 1, 2024, Plaintiff emailed Defendants requesting policy guidance, advising he would be coming to campus to counterprotest.

79. On May 1, 2024, Plaintiff videoed the encampment to memorialize the inflammatory and disruptive nature of encampment activities.

80. Audiovisual equipment including projectors and speaker systems was set up blaring slogans and chants throughout the area.

81. Plaintiff also documented a kitchen and "medic" tent in the encampment.

82. Defendant Rutgers allowed the camp to employ unlicensed security personnel, so-called "Safety Marshals" to enforce encampment rules.

83. As Plaintiff walked through his own campus, he was pursued and surveilled by these Safety Marshals acting with impunity.[3]

84. Signage throughout the encampment included a variety of offensive, violent, and provocative slogans supporting radical causes.

85. A list of Encampment Guidelines was posted, including "No photography or videography without affirmative consent, unless to record police," "All community members aligned with the movement's values are welcome in the camp," (by implication, those with opposing viewpoints are not welcome), "Do not engage with the police, we have people for that."

86. Affixed to Rutgers property was a list of demands from the encampment organizers, among whom were faculty members, non-students, and activists unaffiliated with Rutgers.

87. This included a discriminatory, anti-military demand that Rutgers and all Newark schools prohibit and remove military recruiting.

[3] Defendant Rutgers' Police coordinated operations with the Safety Marshals and acknowledged an encampment attorney liaison to interface with regarding encampment activities. It is also rare for a Police Chief to make an arrest.

88. Plaintiff observed signs posted on the front entrance of the law school; "There is only one solution "Intifada Revolution," and "Divest Now."

89. Plaintiff hung his own counterprotest signs above or adjacent to some of the pro-Palestinian protest signs.

90. This included planting American flags, and posting signs saying, "Hamas are dirty savages," "Hamas does not ask for consent," "terrorist sympathizers," "no ceasefire until all Hamas soldiers are dead," "Intifada AKA kill jews."

91. Plaintiff was confronted, cursed at, and threatened with shouts of, "fuck you, Zionist," "baby killer!" and worse.

92. Other protestors threw Plaintiff's flyers and flags in the garbage.

93. At Plaintiff's request, Rutgers Police responded, but refused to take a report.

94. When Plaintiff attempted to repost his flyers to the area where a "Globalize the Intifada" poster had been hung, Rutgers Police told him he would be arrested if he did so.

95. Plaintiff asked Rutgers Police if the "Globalize the Intifada" poster would be removed, the Police explained they had requested the encampment do so, but they had refused.

96. When Plaintiff offered to take it down, Rutgers Police told him he would be arrested if he did.

97. After leaving, Plaintiff was concerned with the behavior of Rutgers Police.

98. Rutgers Police allowed protestors to tear down his signs and harass him,

and when he reported it, did nothing to protect his rights, blamed him, and told him he would be arrested if he removed encampment signs.

99. Plaintiff later emailed Defendants Bond and Regina advising them he would be on the Campus in the morning to counterprotest.

100. On May 2, 2024, Plaintiff was engaged in lawful speech protected by the First Amendment, and the Constitution of New Jersey.

101. Plaintiff hung signs critical of Hamas, supportive of Israel and the United States, posted small U.S. and Israeli flags, and engaged encampment protestors in lawful, protected speech and debate.

102. Plaintiff's signs and flags were collocated with encampment signs, tents, flags, banners and stickers within the plaza.

103. Plaintiff was the lone pro-Israel/America counterprotester amidst the encampment of pro-Palestinian students, faculty, and political activists.

104. Plaintiff noticed all his flyers were removed from the law school, so he tried to speak to a dean about the situation.

105. Plaintiff noticed Defendant Regina in her office talking on the phone, but when she noticed the Plaintiff, she shut her door.

106. The receptionist told the Plaintiff there was no Dean available.

107. Plaintiff spoke with Dean Ronald Chen who was sympathetic, however declined to comment because he is an administrator.

108. Plaintiff began to post flyers in the plaza "protest area," but a protestor immediately tore down his flyers in presence of the Rutgers Police.

109. Rutgers Police did nothing, so Plaintiff kicked a pro-Palestinian sign.

110. While taking no action to protect Plaintiff's rights, Rutgers Police acted zealously to protect the encampment, separating Plaintiff and the protestor, advising removal of flyers would result in arrest.

111. Encampment Safety Marshals stalked Plaintiff with impunity wherever he went in the law school plaza.

112. Plaintiff, now carrying an American flag, went back to posting his flyers.

113. Less than five minutes later, Plaintiff was confronted at least 11 Rutgers Police officers who formed a perimeter around him, joined by Rutgers security officers, and several encampment Safety Marshals.

114. While the encampment itself was illegally engaged in deployment of an unlicensed and unauthorized security force, Defendant Rutgers took no action against it.

115. Despite encampment occupants posting violent, threatening, discriminatory slogans, and imagery throughout the plaza, and repeated disruptions of student life, Defendant Rutgers did nothing.

116. Instead, the illegal and uncivil behaviors of the encampment were aided, condoned, and ratified by Defendant Rutgers.

117. In contrast, the Plaintiff was confronted by a police officer, identity then unknown, as he had no name tag, and was in civilian clothes.

118. Another Rutgers Police supervisor then requested the Plaintiff stop and speak to him, and with no lawful reason to do so, grabbed the Plaintiff by the arm to stop him and guide him away to speak somewhere else.

119. Plaintiff chose to continue his counterprotest, but Rutgers Police

continued to impede his free speech, stating flyers critical of Hamas were "inflammatory" and warning Plaintiff to limit his speech.

120. Defendant Rutgers placed no limit on size, place, scope, manner, time, content, or means of expression of the encampment, but took official actions to stop Plaintiff's dissenting political expression.

121. Rutgers incongruently allowed encampment protestors to do whatever they wanted, whenever they wanted, and however they wanted.

122. As Plaintiff exercised his freedom of speech, he was again surrounded by Rutgers Police, encampment Safety Marshals, and Rutgers civilian security guards acting in concert.

123. Safety Marshals followed closely behind Plaintiff, almost touching him and the Rutgers police did nothing.

124. One of the Safety Marshals whistled and a male in pink shorts emerged from a tent with a club-like object in his hand, taking an unmistakable offensive-ready stance, but again the Rutgers Police did nothing.

125. A Rutgers Police officer then tore down and threw Plaintiff's flyers the garbage in front of him, showing contempt for his constitutional rights.

126. The middle-aged male in civilian clothes, whom officers on scene deferred to, again engaged the Plaintiff and warned if Plaintiff continued to post flyers, he would be arrested.

127. Two of the Plaintiff's protest flyers, one saying, "Hamas are Dirty Savages" and a another with a photo of Hamas terrorists with the word "savages," were cited as examples of "inflammatory and offensive" speech by the

then–unknown police official.

128. The police official then asserted posting flyers was not “speech” contending it was a disorderly “action,” and that Plaintiff would be arrested if he continued.

129. While surrounding him, Rutgers Police told Plaintiff his protest was “incitement” and that he was risking arrest.

130. Plaintiff argued he was not engaged in incitement, that the encampment had inflammatory statements posted throughout the law school, and no police action was being taken against them.

131. The senior police officer claimed the Plaintiff had no right to post where encampment protestors had.

132. Plaintiff explained in turn that police have no right to tell him what he can and cannot say, hung up another sign, and an officer immediately tore it down, leaving adjacent pro-Palestinian signage untouched.

133. Plaintiff continued to post his flyers and the police continued to follow him and tear each of them down, prompting Plaintiff to ask why his flyer stating, “Stand with America, Stand with Israel,” was taken down, and how it was inflammatory.

134. The lead uniformed police officer than told the other police officers that in his opinion that message was OK and could be left up.

135. Plaintiff told the police officer he had a right to protest, and that if exercising that right meant he had to go to jail, he was willing to do so.

136. When Plaintiff then sought to place an American/Israeli flag flyer, he was

arrested, his American flag thrown to the ground, was placed in handcuffs and carted away like a criminal.

137. Plaintiff recalls it was the then–unknown middle-aged civilian clothed male who placed him under arrest; this individual told the Plaintiff he was under arrest, instructed him to place his hands behind his back, and placed his hand on the Plaintiff to restrain him; each is a legal element of an arrest police officers are trained to take.

138. It was unclear at the time if this person had any authority to effect an arrest, he was in civilian clothes with no visible sign of police authority.

139. As Plaintiff was taken away, the male in civilian clothing was seen conferring with an encampment-appointed Safety Marshall.

140. On information and belief, the arresting officer, the then–unknown individual in civilian clothes, was Rutgers Newark Chief of Police Carmelo Huertas

141. Rutgers attempted to conceal this fact by having another police officer complete the Complaint Summons.

142. Instead of truthfully listing Defendant Huertas as arresting officer, Defendant Rutgers concealed his identity, attempting to shield Defendant Huertas and Rutgers from liability, and it is important to recount the arrest in context.

143. Defendant Huertas was observed engaging in a conversation with encampment Safety Marshals, prior to the arrest, including the individual who had been observed holding a club-like object.

144. Defendant Huertas' conversation with the encampment Safety Marshals shows that Rutgers colluded with the unauthorized security force.

145. After conferring with the Safety Marshals, Defendant Huertas approached the Plaintiff and asserted the Plaintiff was engaging in "incitement," and that posting flyers is "action" and not "speech."

146. Defendant Huertas does not identify himself as a police officer, is wearing no badge, firearm or other signs of police authority, yet asks the Plaintiff if he "wants to be arrested."

147. Plaintiff responded if he is to be arrested for posting flyers saying Hamas, a terrorist organization, are savages, then yes, he wanted to be arrested.

148. Defendant Huertas then gets on his phone and appears to be communicating with someone, perhaps seeking instructions.

149. The senior uniformed police officer is meanwhile engaging Plaintiff and tears down an anti-Hamas flyer the Plaintiff had posted, while leaving anti-Israel flyers posted.

150. At instruction of the senior uniformed police officer, other police officers begin to remove the Plaintiff's political speech, leaving the speech of the pro-Hamas encampment untouched.

151. Soon after, Defendant Huertas arrests the Plaintiff, purportedly for "disorderly conduct," and "incitement."

152. Plaintiff was subjected to arrest in front of the encampment members, who continued breaking laws and Rutgers policies with impunity.

153. Defendant Huertas was also seen conferring with encampment appointed

security and/or leadership again after the Plaintiff's arrest.

154. The Plaintiff was perp-walked in handcuffs through the encampment.

155. The Plaintiff was brought to Rutgers Newark Police Headquarters, where he was fingerprinted, photographed, and placed in a cell.[4]

156. It was several hours before the Plaintiff was released from custody.

157. The Plaintiff was also charged by Rutgers with student conduct violations.

158. The encampment persisted for another month, and no participants were arrested, and despite ongoing violations of Rutgers' policy, no other participant was subject to student conduct charges.

159. The Rutgers arrest caused Plaintiff embarrassment, mental anguish, humiliation, loss or reputation, and loss of educational/job prospects.

160. Plaintiff faced difficulty being barred as the arrest would impact negatively on the Character and Fitness process.

161. Rutgers Police were aware of adverse collateral effects of arrest, but with reckless disregard for his rights, arrested the Plaintiff anyway.

162. Plaintiff had to obtain legal counsel to contest the false incitement charge inflicted on him by Defendant Rutgers.

163. Plaintiff's disorderly persons Incitement charge reached the Newark Municipal Prosecutor in July 2024 and was dismissed, then expunged.

164. Rutgers refused to drop the student conduct charges.

165. Defendant Rutgers decided the charges were moot because Plaintiff

[4] It is unusual for an arrestee to be booked, photographed and fingerprinted for a Petty Disorderly Persons in New Jersey.

graduated, but if he reenrolled at Rutgers, the charges would be revived; effectively a lifetime ban from attending Rutgers University.

166. The Plaintiff was the only counterprotester supporting America, the United States Military, Israel, and Jewish students on campus.

167. Plaintiff was singled out for criminal and administrative prosecution by Defendant Rutgers.

168. The Complaint and Summons narrative of Plaintiff's arrest states “Rutgers University Staff” alerted police Plaintiff was on his way to the campus to counterprotest and tear down items in support of Palestine.

169. The Complaint Summons also claims Plaintiff was arrested because he would not relocate to a protest area, but body worn camera and witness videos show arrest was based on the content of Plaintiff’s speech.

170. The same “University Staff” lodged no complaints with police against the encampment.

171. Rutgers Law administrators, including Defendants Bond and Regina perceived Plaintiff as a “Jewish law student.”

172. Defendants Bond and Regina were aware of Plaintiff's viewpoint supportive of Israel and America from previous counterprotests.

173. Defendant Bond and Regina were notified by the Plaintiff he intended to counterprotest on May 2, 2024.

174. On information and belief, Defendants Bond and Regina were among the “Rutgers University Staff” who alerted police to the Plaintiff’s planned counterprotest.

175. Defendants Bond, Regina, Huertas, and Rutgers targeted the Plaintiff due to his perceived identity as a Jewish law student, his status as a veteran, and his dissenting political views supporting the United States and Israel, opposed to Hamas; Views disfavored by Defendants.

176. Defendant Rutgers anti-racist policy requires discrimination against political viewpoints that do not align with “anti-racism.”

177. Under Defendant Rutgers anti-racist policy Palestinians are an oppressed, indigenous group and People of Color, while Israelis (and by extension, Jewish people or their supporters) are white, racist colonizers who must be defeated “no matter the cost.”

178. Rutgers endorses a philosophy of the “racial Muslim” arguing discrimination against Muslims is “racism.”

179. The pro-Palestinian, anti-American military political viewpoint of the CSRR is endorsed by Defendant Rutgers and constantly reinforced.

180. Professors and administrators directly participated in violating Plaintiff’s rights to freedom of speech and expression because they did not align with Rutgers’ favored political viewpoint.

181. Given the anti-racist policy of Rutgers Law, discrimination against, and violation of the Plaintiff’s civil rights was a foreseeable result.

182. Rutgers Police enforced the unconstitutional anti-racist policy of Defendant Rutgers by arresting Plaintiff for his disfavored viewpoints.

183. Defendants violated the Plaintiff’s civil rights under color of law by falsely arresting him under the pretext of “incitement.”

184. Defendant Rutgers is grossly negligent for failing to train their police officers on the constitutional rights of protestors.

185. Had the Rutgers Police Department been properly trained, the Plaintiff would not have been arrested for lawfully exercising his rights.

186. Defendant Rutgers was grossly negligent for failing to supervise the police officers on duty at Rutgers Newark on May 2, 2024, in that if properly supervised the Plaintiff would not have been falsely arrested.

187. Rutgers University Staff conspired with Rutgers Police to violate the Plaintiff's civil rights by coordinating his arrest for lawfully exercising his constitutional right to counterprotest.

188. Defendant's willful discrimination and violation of the Plaintiff's civil rights caused him humiliation, embarrassment, severe emotional distress, monetary loss, damage to his reputation, loss of opportunity, and debilitating mental anguish.

189. The actions of Defendants Rutgers, Bond, Regina, Huertas and the Rutgers Police Department were the foreseeable, direct and proximate cause of Plaintiff's damages.

190. Defendants' actions are outrageous, extreme and willful, done with reckless disregard for the Plaintiff's rights.

191. This matter qualifies for, and the Plaintiff seeks, punitive damages.

**FIRST COUNT: NEW JERSEY LAW AGAINST DISCRIMINATION (ACTUAL OR PERCEIVED RACE, ETHNICITY, OR RELIGION/HOSTILE EDUCATIONAL ENVIRONMENT)**

192. The NJLAD protects students from discrimination and harassment based on actual or perceived race, national origin, ancestry, or religion.

193. The NJLAD requires universities to proactively address and respond to harassment, including peer-on-peer harassment and discrimination.

194. Between October 7, 2023, and May 2, 2024, Rutgers Law Newark, became a hostile educational environment for Jewish students.

195. Plaintiff's Jewish peers reported being threatened and unsafe on campus, and afraid to go to the campus, even for final exams.

196. Plaintiff observed the campus was overtly hostile towards Jewish students or those perceived to support Jewish students, and/or Israel.

197. This hostile educational environment was documented in media accounts, testimony of students, lawsuits, and official investigations.

198. Plaintiff was perceived as a Jewish law student.

199. Based on his perceived Jewish faith and ethnicity, Plaintiff was targeted for bias-based harassment and discrimination.

200. Based on his opposition to antisemitism and support for Israel, Plaintiff was targeted for bias-based harassment and discrimination.

201. The bias-based harassment and discrimination resulted in denial of his right to freedom of political speech and expression, false arrest, and malicious abuse of the University Code of Conduct.

202. Defendants Rutgers, Bond, Regina, and Huertas knew or should have known discrimination and bias-based harassment for actual or perceived race, religion, or ethnicity is illegal.

203. On May 1, 2024, when the Plaintiff attempted to counterprotest the encampment, he was ridiculed by camp residents as a Zionist, cursed at, yelled at, harassed, and stalked by encampment Safety Marshals.

204. Defendant Rutgers' Police took no action to protect Plaintiff.

205. On May 2, 2024, when the Plaintiff attempted to exercise his freedom of speech on campus, he was impeded under the direct control of Defendant Huertas, and then arrested by Defendant Huertas, the Rutgers Newark Chief of Police.

206. While Defendant Huertas allowed hundreds of highly offensive, anti-Semitic, and anti-Isreal signs, stickers, and postings to be affixed throughout areas of campus illegally occupied by the encampment, Defendant Huertas deemed the Plaintiff's Israeli flag flyer, and flyers critical of terrorist organization Hamas to be "incitement."

207. Acting on the orders and instructions of Defendant Huertas, officers restrained the Plaintiff physically from exercising pro-Israel speech.

208. Acting on instructions of Defendant Huertas, officers tore down Plaintiff's pro-Israel flyers and flags, leaving pro-Palestinian viewpoints untouched.

209. Defendant Huertas took no action when Police Officers under his command and control threw the Plaintiff's flyers out in front of the Plaintiff, in an unmistakable act of contempt for, and rejection of, his

disfavored pro-Israel political speech.

210. Defendant Huertas made the legally unsupportable claim to the Plaintiff that hanging pro-Israel protest flyers was an “action” not speech.

211. During the over month-long encampment, no other students were arrested by the Rutgers Newark Police Department for protest activities.

212. During the over month-long encampment Defendant Huertas made no other arrests of a student.

213. When the encampment was disbanded in June 2024 protestors became disorderly, yet none were arrested.

214. After his arrest the Plaintiff attempted to discuss the issue with Defendant Bond, however she refused to discuss it with him.

215. Rutgers Law School administrators including Defendants Bond and Regina perceived the Plaintiff as a Jewish law student.

216. Defendant Huertas was also aware the Plaintiff had been described as a “Jewish law student” and the Plaintiff was deemed a security threat.

217. Defendant Huertas instructed his officers directly, or though subordinates, to single out the Plaintiff for police surveillance, having the effect of chilling the Plaintiff’s constitutional rights to free speech.

218. The pro-Palestinian encampment members who were not perceived as Jewish, were allowed to act with impunity, doing, posting, and saying whatever they wanted without interference.

219. Defendant Rutgers maintains an Anti-Racist Principles & Action policy mandating that the only cure for racist discrimination is antiracist

discrimination.

220. Those who do not actively engage in the antiracist principles are viewed as racists to be opposed "no matter the cost" per Rutgers Law policy.

221. The Plaintiff was perceived as a white, Jewish student.

222. Defendant Rutgers' perceives white Jewish Israelis as racist colonizers of Palestine seeking to displace an oppressed indigenous Palestinian population of People of Color.

223. Defendant Rutgers' Anti-Racist Principles & Action policy sanctioned the harassment and discrimination suffered by the Plaintiff.

224. The discrimination suffered by the Plaintiff was the foreseeable result of Defendant Rutgers' Anti-Racist Principles and Action policy.

225. Defendants engaged in repeated acts of illegal, bias-based harassment, intimidation and discrimination against the Plaintiff.

226. Defendants' pattern and practice of illegal bias-based discrimination led the Plaintiff, a Law Student perceived as being of Jewish, to the reasonable conclusion the educational environment had become hostile.

227. Defendants' acts of illegal bias-based discrimination caused the Plaintiff severe emotional distress, humiliation, loss of personal and professional reputation, deprived him Constitutional rights, deprived him of his freedom through false arrest, permanently marred his educational record with malicious misconduct charges, and effectively barred Plaintiff from attending Rutgers for life.

228. But for Defendants illegal bias-based discrimination and harassment, the

Plaintiff would not have been damaged.

229. Defendants' actions are the actual and proximate cause of Plaintiff's damages, Defendant are liable to the Plaintiff for those damages.

230. Defendants acted knowingly and with reckless disregard for the Plaintiff's rights, qualifying this matter for punitive damages.

**SECOND COUNT: NJLAD (ASSOCIATIONAL DISCRIMINATION HOSTILE EDUCATIONAL ENVIRONMENT)**

231. The NJLAD makes it illegal to engage in bias-based harassment and discrimination based on association with a protected class.

232. Jewish persons are members of a protected class in the State of New Jersey under NJLAD.

233. Between October 7, 2023, and May 2, 2024, the Plaintiff engaged in protected political speech supportive of Israel.

234. Israel is a Jewish nation, closely associated with all Jewish people if not by actual citizenship, then by inference.

235. Defendants zealously chilled, stifled, and utilized lawfare to stop the Plaintiff from speaking out in favor of the Jewish state of Israel.

236. Plaintiff was the lone dissenting voice on the campus speaking up in support of Israel, Jewish people, and against Hamas.

237. The Plaintiff was harassed by faculty, staff, and administrators of Defendant Rutgers based on association with Jewish students.

238. When the Plaintiff refused to abandon his support for Israel, he was falsely arrested by the Rutgers and subject to Code of Conduct violations.

239. In contrast, no pro-Palestine movement encampment had their activities curtailed, nor were any subject to arrest or other adverse action.

240. To the contrary, Defendants aided, condoned, and ratified the pro-Palestinian viewpoint, disfavoring Plaintiff's support for Israel.

241. Defendant Rutgers maintains an Anti-Racist Principles & Action policy, which by implication views Israel as an oppressive, colonial state and the Jewish people as white, racist colonizers.

242. Per Defendants' policy, the only remedy to racist discrimination is antiracist discrimination.

243. The Plaintiff expressed his pro-Israel views within the hostile educational environment of Rutgers Law Newark.

244. Plaintiff was subject to bias-based harassment and discrimination by Defendants based on his association and support for the Jewish nation of Israel, and by inference his Jewish peers.

245. Plaintiff's support for Israel identified him as a supporter of Jewish law students, faculty, and staff.

246. But for his close association with, and support for the rights of Israel and Jewish law students, the Plaintiff would not have been subjected to bias-based intimidation, harassment, and discrimination.

247. Defendants' pattern and practice of bias-based discrimination and harassment was severe and pervasive enough to lead the Plaintiff to believe conditions were altered and that the educational environment was intimidating, hostile, and abusive.

248. Defendants' acts of illegal bias-based discrimination caused the Plaintiff severe emotional distress, humiliation, loss of personal and professional reputation, deprived him of his First Amendment rights, deprived him of his freedom through false arrest, permanently marred his educational record with malicious misconduct charges, and effectively banned the Plaintiff from attending Rutgers for life.

249. But for Defendants illegal bias-based discrimination and harassment, the Plaintiff would not have suffered damages.

250. Defendants' actions are the actual and proximate cause of Plaintiff's damages, Defendant are liable to the Plaintiff for those damages.

251. Defendants acted knowingly and with reckless disregard for the Plaintiff's rights, qualifying this matter for punitive damages.

**THIRD COUNT: NJLAD RETALIATION**

252. Rutgers Law School Newark is a place of public accommodation.

253. The NJLAD prohibits retaliation against those who oppose prohibited practices in a place of public accommodation.

254. Bias-based harassment and discrimination based on ethnicity, religion, and/or national origin is prohibited by the NJLAD.

255. Plaintiff complained to Defendant Rutgers about antisemitism on Defendant Rutgers' Newark Law School campus.

256. Plaintiff complained openly by engaging in protected speech and expression, and by directly complaining about antisemitism and anti-Israel bias to Rutgers Law School administrators.

257. The Plaintiff was subject to the adverse actions of false arrest, malicious prosecution, and University Code of Conduct violations by Defendant Rutgers.

258. The adverse actions were the direct the result of the Plaintiff openly opposing antisemitism, anti-Israel, and anti-veteran biased actions on the campus by pro-Palestinian protestors.

259. There is a direct causal connection between the Plaintiff's protected speech and the adverse actions taken against him by Defendant Rutgers.

260. Plaintiff reasonably, in good faith, believed that antisemitism, anti-veteran, and anti-Israel harassment and discrimination violated the law.

261. But for Plaintiff's complaints, and opposition to bias-based harassment and discrimination, illegal under the NJLAD, Defendants would not have retaliated against him.

262. Defendant Rutgers is liable to the Plaintiff for damages.

## FOURTH COUNT: FALSE ARREST

263. On May 2, 2024, the Plaintiff was exercising his rights to freedom of political speech and expression guaranteed by the Constitutions of the United States and the State of New Jersey.

264. Plaintiff was lawfully on the campus of Rutgers Law School Newark where he was a Law Student.

265. Plaintiff engaged in constitutionally protected speech within a designated protest area on the Rutgers campus.

266. Plaintiff hung flyers critical of the terrorist organization Hamas and

posted American and Israeli flags.

267. The Plaintiff was confronted by Chief of Police Huertas, and at least 11 Rutgers Police Officers, Rutgers Security Officers, and encampment-appointed Safety Marshals.

268. Unlike the speech of the encampment, the Plaintiff's speech was critiqued for content by the Rutgers Police Department and criticized as "inflammatory."

269. The Rutgers Police Department deemed the Plaintiff's political speech, inflammatory, ignoring hundreds of highly offensive political slogans, messages, signs, posters and other postings by the pro-Palestine encampment.

270. The Rutgers Police Department, personally led at the scene by Defendant Huertas, enforced disparate standards for the Plaintiff, due to his disfavored political viewpoint, not his behavior.

271. The Plaintiff was charged with Disorderly Conduct.

272. Defendant Huertas was the arresting officer.

273. The narrative of the Complaint Summons inaccurately claims Plaintiff was arrested because he refused to go to a designated protest area.

274. The Complaint Summons narrative specifically highlights the content of the Plaintiff's political speech as basis for his arrest.

275. Defendant Huertas arrested the Plaintiff for "incitement."

276. Defendant Huertas is the Chief of Police and as such knew or should have known Plaintiff's political speech was constitutionally protected and

not "incitement."

277. Defendant Huertas and his subordinate police officers detained the Plaintiff against his will.

278. There was neither legal justification for, nor probable cause for Defendant Huertas to arrest the Plaintiff.

279. The Complaint Summons fails to note that the arrest was personally initiated and conducted by Defendant Huertas, the Chief of Police.

280. Plaintiff suffered humiliation, embarrassment, loss of personal and professional reputation, loss of civil rights, and severe emotional distress due to the false arrest by Defendant Huertas and the Rutgers Police Department.

281. Defendant Huertas is Chief of Police; the official actions of Defendant Huertas and the official actions and policies of Defendant Rutgers are inseparable.

282. Defendants are the actual and proximate cause of Plaintiff's damages.

283. But for Defendants' actions, Plaintiff would not have suffered damages.

284. Defendants Huertas, Rutgers, Gonalez, and currently unknown others, are liable to the Plaintiff for damages.

**FIFTH COUNT: MALICIOUS PROSECUTION**

285. On May 2, 2024, Defendants Rutgers, Huertas, and Gonalez charged the Plaintiff with the Petty Disorderly Persons Offense of Disorderly Conduct.

286. There was no probable cause or legal justification for the charge.

287. There were no reasonable circumstances that would lead Defendant

Huertas to believe the Plaintiff was guilty of Disorderly Conduct.

288. The criminal charge was meant to punish Plaintiff for opposition to the pro-Palestinian encampment.

289. The charge was initiated after consultation between Defendant Huertas, and leadership of the protest encampment.

290. In July 2024 the charge was dismissed by the Newark Municipal Prosecutor as legally unsustainable and thereafter expunged.

291. The Plaintiff suffered humiliation, embarrassment, loss of personal and professional reputation, loss of civil rights and liberties, and severe emotional distress due to malicious prosecution by Defendants Huertas, Gonzalez and Rutgers.

292. Defendant Huertas is the Chief of Police for Rutgers Newark; his official actions and the policies of Defendant Rutgers are inseparable.

293. Defendants Huertas, Rutgers, Gonalez and currently unknown others, are liable to the Plaintiff for damages.

**SIXTH COUNT: CIVIL CONSPIRACY**

294. Defendants Bond, Regina, Huertas, and others unknown conspired to violate Plaintiff’s civil rights.

295. Defendants Bond and/or Regina notified Defendant Huertas Plaintiff was coming to the campus to engage in disfavored political speech.

296. Defendants formed an agreement Plaintiff’s constitutionally protected speech was problematic as it is disfavored by Rutgers policy.

297. Defendants’ agreement resulted in disproportionate police scrutiny of

Plaintiff's political speech.

298. On May 2, 2024, Defendant Huertas in concert with Defendants Bond, Regina, and with unknowns, orchestrated false arrest of the Plaintiff.

299. Plaintiff suffered violation of civil rights under the color of law when the conspiracy came to fruition with the arrest by Defendant Huertas.

300. The conspiracy to violate Plaintiff's rights and punish him for his disfavored political speech also resulted in University Code of Conduct violations which remain active.

301. Plaintiff suffered actual damages as the result of the civil conspiracy among the Defendants.

302. Defendants are liable to the Plaintiff for his damages.

**SEVENTH COUNT: MALICIOUS USE OF PROCESS**

303. Defendant Rutgers brought malicious University Code of Conduct charges against Plaintiff, and despite his criminal charge being dismissed and expunged, have maliciously refused to drop the charges.

304. Rutgers effectively bans Plaintiff from attending Rutgers by holding the charges in abeyance; the charges would be reinstated if he reenrolls.

305. Defendant Rutgers' failure to mitigate the collateral damage of the false arrest is malicious and shows reckless disregard for Plaintiff's rights.

306. Emotional distress caused by the false arrest led Plaintiff to forgo taking the New Jersey Bar Exam.

307. Plaintiff was compelled to expend energy and resources defending himself from Defendants' false arrest, malicious criminal prosecution, and

malicious abuse of the University Code of Conduct violation process.

308. Due to the malicious use of the University Code of Conduct process the Plaintiff suffered damages.

309. Defendants' malicious use of the University Code of Conduct process directly and naturally was a substantial factor in bringing about the injuries suffered by the Plaintiff, and without Defendants malicious actions, the Plaintiff's injuries would not have occurred.

310. Defendants are liable to the Plaintiff for damages sustained as the result of their malicious use of University Code of Conduct process to harm the Plaintiff.

311. The Plaintiff suffered humiliation, embarrassment, loss of personal and professional reputation, loss of civil rights, loss of opportunity, and severe emotional distress due to malicious use of process by Defendants Rutgers, Bond, Regina, and others, identities currently unknown.

312. Defendants' malicious acts and reckless disregard for the Plaintiff's rights qualify this matter for punitive damages.

## EIGHTH COUNT: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

313. Plaintiff is a disabled, medically retired veteran.

314. Defendant Rutgers is a recipient of federal funding subject to Section 504 of the Rehabilitation Act of 1973 prohibiting discrimination against disabled veterans.

315. Defendants deliberately discriminated against the Plaintiff for being a

disabled veteran.

316. Defendants Bond and Regina view the Plaintiff as dangerous based stereotypes that PTSD creates violent tendencies in veterans.

317. When Plaintiff expressed dismay his freedom speech was violated by Professor Aziz, Defendants referred him to mental health services.

318. Defendants grossly overreacted to the Plaintiff's constitutionally protected political speech by subjecting him to law enforcement scrutiny, treating him as a security threat, and ultimately conspiring to arrest him

319. Plaintiff was the only person arrested, despite there being hundreds of disorderly protestors who were allowed to act with impunity.

320. While illegal, disruptive activities of the encampment were allowed to continue for over a month, Plaintiff was subjected to intense scrutiny, and arrest on May 2, 2024, only a day after the encampment began.

321. Plaintiff was singled out for law enforcement action, while activists in the protest encampment continued illegal activities with impunity.

322. Based on the illegal discrimination against Plaintiff due to his protected status as a disabled veteran, Plaintiff was subject to educational harms.

323. But for Defendants' intentional discrimination against the Plaintiff based on his status as a disabled veteran, he would not have been damaged.

**NINTH COUNT: NEW JERSEY CIVIL RIGHTS ACT**

324. The Constitution of New Jersey, Article I, ¶ 6 guarantees that every person may freely speak on all subjects.

325. Defendants denied the Plaintiff his right to speak freely, under the

Constitution of New Jersey, Article I, ¶ 6, by arresting him for engaging in disfavored political speech.

326. Specifically, when Plaintiff engaged in political speech on May 1, 2024, and May 2, 2024, Plaintiff was deprived of his right to speak freely on the Israel/Palestine conflict under the color of law.

327. Defendant Huertas took and orchestrated direct malicious action under the color of law against the Plaintiff conducting a false arrest and charging the client with Disorderly Conduct.

328. The Complaint Summons does not detail how Plaintiff was disorderly, but summarizes Plaintiff's disfavored speech in all caps, showing the content of the plaintiff's speech was the issue, not his conduct.

329. Plaintiff was processed at the Rutgers Newark Police Department and immediately returned to the Law School campus where he resumed protesting.

330. The Plaintiff engaged in the exact activities he had been arrested for by Defendant Huertas hours earlier, and he was not rearrested.

331. Rutgers Police attempted to force the Plaintiff to protest in a separate area, the Plaintiff refused, telling Police they could not force him to; the Police then admitted that they had no legal right to do so.

332. This is incongruent with the purported reason for Plaintiff's arrest in the narrative section of the Complaint Summons.

333. When Plaintiff returned to the campus, Rutgers Police, on the orders of Defendant Huertas conducted close surveillance of the Plaintiff, following

the Plaintiff everywhere, chilling his free-speech rights through constant, individual police surveillance, creating a threat of imminent arrest.

334. Article I, ¶ 7, of the Constitution of New Jersey protects individuals from unreasonable searches and seizures.

335. Defendant Huertas, Gonzalez, and Rutgers violated the Plaintiff's right against unreasonable search and seizure under the color of law by improperly arresting, searching, and detaining the Plaintiff.

336. The charge filed against the Plaintiff by Defendants Huertas, Gonzalez, and Rutgers was dismissed as legally unsustainable.

337. Defendant Huertas is the Chief of Police of Rutgers Newark, as the Chief of Police, his actions are inseparable from the official policy of Rutgers.

338. Violation of the Constitutional rights of those with disfavored viewpoints is inherent to Defendant Rutgers Anti-Racist Principles & Action policy.

339. It is the formal and informal policy of Defendant Rutgers to discriminate against those who engage in disfavored political speech.

340. Violation of the Plaintiff's constitutional rights under the color of law was foreseeable under the written and informal policies of Defendant Rutgers.

341. As a result of Defendants' unconstitutional actions under the color of law, the Plaintiff suffered deprivation of his civil rights, civil liberties, embarrassment, humiliation, loss of income, loss of personal and professional reputation, fear and uncertainty of criminal court proceedings, and a permanent record of Student Conduct charges.

342. But for the illegal actions of the Defendants depriving the Plaintiff of his

civil rights he would not have suffered damages.

343. The Defendants actions are the cause in-fact and proximate cause of the Plaintiff's damages.

344. The Defendants are liable jointly and severally to the Plaintiff for damages.

345. Actions of Defendants are outrageous, extreme and shock the conscious; the actions were willful and done with reckless disregard for the Plaintiff's rights.

346. This matter qualifies for, and the Plaintiff seeks, punitive damages.

**TENTH COUNT: TORTIOUS INTERFERENCE WITH CONTRACT**

347. Plaintiff was a student at Rutgers Law School on May 1, 2024.

348. The Plaintiff had an implied and actual contract with Defendant Rutgers/Rutgers Law School to obtain an education formed by Rutgers policy, procedures, agreements, and standards jointly entered by Defendant Rutgers and Plaintiff.

349. Plaintiff attended Rutgers Law School for three years on a dual JD/MBA program and was set to graduate in May of 2024.

350. Between October 7, 2023, and May 1, 2024, Defendant Newark Water Coalition ("NWC") controlled by Defendant Diaz, planned to disrupt educational activities and student life at Rutgers Law School Newark.

351. Defendant NWC supplied funding, knowledge, and resources to plan, organize, execute, and supply a protest encampment on the plaza at Rutgers Law School from May 1, 2024, to June 4, 2024.

352. Defendants NWC and Diaz were aware setting up a protest encampment on the plaza was illegal and against Rutgers University regulations.

353. Defendants NWC and Diaz knew the illegal encampment and disruptive protest tactics, techniques, and procedures planned would interfere with student life, but willfully disrupted the Plaintiff's education anyway.

354. Defendant Diaz publicly admitted to being the leader of the encampment, organizing the encampment, and providing logistical support.

355. Defendant Diaz, while engaged in protest activities under the auspices of the NWC, admitted a goal of disrupting educational activities on campus.

356. Defendant Diaz's actions were willful and malicious, done with reckless disregard for the education of the Plaintiff.

357. Defendants NWC and Diaz had no right to set up an encampment, nor to interfere with Plaintiff's education on the Rutgers Law campus.

358. Defendants NWC and Diaz took daily actions to disrupt and interfere with campus life.

359. Defendants NWC and Diaz organized and operated an unlicensed, unauthorized security force of "Safety Marshalls" who harassed and intimidated the Plaintiff.

360. Defendant NWC was not authorized to conduct business on campus.

361. Defendant Diaz was not a Rutgers student and did not enjoy the rights and privileges of a student to the campus.

362. Defendant Diaz is not an employee, agent, or assign of Rutgers and had no right to establish/operate an unlicensed security force on campus.

363. Defendants NWC and Diaz were not parties to the contractual relationship between the Plaintiff and Rutgers.

364. Defendants NWC and Diaz intentionally interfered with the contractual relationship without justification or cause.

365. Severe disruption and interference with campus life by Defendants NWC and Diaz's extreme protest tactics, techniques, and procedures unreasonably and actually interfered with Plaintiff's contractual rights.

366. The intentional tortious interference with Plaintiff's contractual relationship with Rutgers resulted in damages to Plaintiff by disrupting the law school education he contracted for.

367. The intentional malicious actions of Defendants NWC and Diaz are the foreseeable, actual, and proximate cause of Plaintiff's damages.

368. Defendants Newark Water Coalition and Diaz are liable to the Plaintiff for damages.

**ELEVENTH COUNT: INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS (AGAINST ALL DEFENDANTS)**

369. The Plaintiff was subject to extreme and outrageous behavior by Defendants.

370. The actions were either intentional or done with reckless disregard of a high degree of possibility emotional distress would follow.

371. The actions of Defendants Bond, Regina, and Huertas in conspiring to violate Plaintiff's constitutional rights; The false arrest of the Plaintiff by Defendant Huertas and others, violating his right to freedom of speech

and expression under the color of law.

372. The effect of the false criminal charges on the Plaintiff's education and future career as an attorney.

373. Defendant Rutgers zealously pursuing Conduct charges even after underlying criminal charges were dismissed and expunged, effectively banning Plaintiff from reenrollment for life.

374. Defendants NWC and Diaz organizing, funding, planning, executing, and maintaining the illegal pro-Palestine encampment that outrageously disrupted the Rutgers Law Newark campus for over 30 days.

375. Exposure of Plaintiff to incessant anti-American, anti-Israel, antisemitic, and anti-military, slogans, signage and harangues, (including the encampment), aided, fostered, and condoned by Defendants.

376. No reasonable person could be expected to endure the intensely hostile environment Defendants purposely and maliciously created on campus.

377. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered damages including severe emotional distress, exacerbation of pre-existing injuries, and physical symptoms of stress.

378. Defendants actions are the actual and proximate cause of Plaintiff's damages.

379. Defendants are liable to the Plaintiff for damages.

**TWELFTH COUNT: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST ALL DEFENDANTS)**

380. Defendants had a duty not to engage in behavior that posed an

unreasonable risk of emotional harm to others.

381. Defendants failed in that duty, doing things that a reasonable person would expect to cause severe emotional distress.

382. But for Defendants behavior posing an unreasonable risk of emotional harm, the Plaintiff would not have suffered damages.

383. The behavior of Defendants establishing, organization, executing, and maintaining, the Rutgers Newark protest encampment between May 1, 2024 and June 4, 2024 posed an unreasonable risk of emotional harm.

384. The Plaintiff suffered severe emotional distress due the unreasonable actions of defendants.

385. Defendants' extreme and outrageous behavior was the foreseeable, direct and proximate cause of Plaintiff's damages.

386. But for Defendants' failure to meet their duty, the Plaintiff would not have suffered severe emotional distress.

387. Defendants are liable to the Plaintiff for damages.

**THIRTEENTH COUNT: GROSSLY NEGLIGENT FAILURE TO TRAIN AND SUPERVISE (AGAINST DEFENDANT RUTGERS)**

388. Defendant Rutgers had a non-delegable duty to exercise reasonable care in the training and supervision of their police personnel.

389. Wrongs committed by Defendant Rutgers' police under the color of law relied upon authority provided to them by Defendant Rutgers.

390. Wrongs committed by Defendant Rutgers' police against Plaintiff were committed within the scope of employment, and of the kind police

personnel are employed to perform.

391. Wrongs committed by Defendant Rutgers' police personnel against the Plaintiff were committed within authorized work hours and within the confines of Rutgers' jurisdiction.

392. Wrongs committed by Defendant Rutgers' police personnel against the Plaintiff were committed in furtherance of serving Defendant Rutgers.

393. Defendant Rutgers knew or should have known failing to properly supervise and train police personnel would result in exactly the type of harm, false arrest and violations of civil rights suffered by Plaintiff.

394. Defendant Rutgers Chief of Police, Defendant Huertas, directly participated in, supervised and directed violations of the Plaintiff's constitutional rights under the color of law.

395. By failing to train and supervise their police personnel, Defendant Rutgers caused those harms to materialize, the foreseeable, actual, and proximate cause of the Plaintiff's damages.

396. Defendant Rutgers is liable to the Plaintiff for damages.

397. Defendant Rutgers administrators and Chief of Police directly participated in, aided, abetted and endorsed the egregious harm suffered by the Plaintiff, making this matter eligible for punitive damages.

**FOURTEENTH COUNT: VICARIOUS LIABILITY**

**(AGAINST DEFENDANT RUTGERS)**

398. At all times relevant, Defendants Rutgers and/or John Does 1 to 100 was/were the employer and/or principal of Defendants Regina, Bond,

Huertas, Gonzalez and/or John Does 1 to 100 and were responsible for the conduct of these individual Defendants pursuant to respondeat superior and/or the doctrine of agency.

399. As a direct and proximate result of Defendants' conduct and omissions against Plaintiff, Plaintiff has been damaged.

**PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL ISSUES OF FACT HEREIN.**

**Prayer for Relief**

WHEREFORE, Plaintiff Yiorgos Maravelias prays for judgment as follows:

1. As to Counts One–Three, Four–Seven, and Nine, judgment against Defendants Rutgers University, Sarah Regina, Johanna Bond, Carmelo Huertas, Edwin Gonzales, and John and Jane Does 1 to 100 for: a) Compensatory damages; b) Punitive and exemplary damages; c) Interest; d) Costs of suit; e) Attorney's fees; and f) Injunctive relief.
2. As to Count Eight, judgment against Defendant Rutgers University for: a) Compensatory damages; b) costs of suit, c) injunctive relief to rectify discriminatory practices of Defendant Rutgers.
3. As to Count Ten**,** judgment against Defendants Newark Water Coalition, Anthony Diaz, John and Jane Does 1 to 100, and ABC Corporations 1–25 for: a) Compensatory damages; b) Punitive and exemplary damages; c) Interest; d) Costs of suit; e) Attorney's fees;
4. As to Counts Eleven and Twelve, judgment against all Defendants for: a) Compensatory damages; b) Punitive and exemplary damages; c) Interest;

d) Costs of suit; e) Attorney's fees.

5. As to Counts Thirteen and Fourteen judgment against Defendant Rutgers for: a) Compensatory damages; b) Punitive and exemplary damages; c) Interest; d) Costs of suit; e) Attorney's fees.
6. For such other and further relief as this Court deems just and equitable.

**DONELSON, D'ALESSANDRO & PETERSON LLC**

October 9, 2026

/s/Christopher J. D'Alessandro, Esq.
Christopher J. D'Alessandro, Esq. (NJ279852018)
3 South Broad Street, Suite 3A
Woodbury New Jersey 08096
Telephone: (856) 839-6058
E-mail: chris@ddplawfirm.com
Attorneys for Plaintiff, Yiorgos Maravelias